1    BOIES, SCHILLER & FLEXNER LLP
     Alison L. Anderson (SBN 275334)
2    Joshua Y. Quaye (SBN 325480)
     2029 Century Park East, Suite 1520
3    Los Angeles, CA 90067
     (213) 995-5720
4    alanderson@bsfllp.com
     jquaye@bsfllp.com
5
     Eric J. Maurer (*pro hac vice*)
6    1401 New York Ave., NW
     Washington, DC 20005
7    (202) 237-2727
     emaurer@bsfllp.com
8
     Beko Reblitz-Richardson (SBN 238027)
9    44 Montgomery Street, 41st Floor
     San Francisco, CA 94104
10   (415) 293-6800
     brichardson@bsfllp.com
11
     *Attorneys for Defendant Manaflex LLC*
12

13                **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
14                     **OAKLAND DIVISION**

15

16   CELLINK CORP.,                          Case No. 4:23-cv-04231-HSG

17           Plaintiff,                       **ANSWER AND COUNTERCLAIMS**

18      v.                                    Demand for Jury Trial

19   MANAFLEX LLC,

20           Defendant.

21

22           Defendant Manaflex LLC (Manaflex) hereby answers Plaintiff CelLink Corp.'s (CelLink's)

23   Complaint (ECF No. 1) and brings the below counterclaims against CelLink.

24           CelLink's lawsuit was not actually brought to protect any intellectual property.  Instead,

25   CelLink sued Manaflex for the improper purpose of disrupting Manaflex's business and thwarting

26   competition.  Manaflex has not infringed on, or misappropriated, any valid intellectual property of

27   CelLink's.  Indeed, the patent CelLink brought suit on claims nothing more than concepts that

28   CelLink—including its CEO, Kevin Coakley—have for years understood were in the public domain.

1  CelLink fraudulently obtained that patent by deceiving the United States Patent & Trademark Office

2  into believing that the claimed concepts were new and nonobvious.   As explained in Manaflex's

3  counterclaims, CelLink—including its CEO and its patent prosecution counsel—know that the patent

4  is not even valid—let alone "groundbreaking," as alleged in CelLink's Complaint.

5       CelLink has received major investments based on its representations that CelLink's

6  technology is "groundbreaking" and intellectual property valid, while knowing that its '070 patent is

7  invalid and obtained by deception. And now, CelLink is failing to deliver on its promises and

8  representations.  CelLink knows that Manaflex is an emerging significant competitor that is young,

9  hungry, innovative, and developing better technology than CelLink and at lower price points.

10 Instead of legitimately competing with Manaflex, CelLink brought this lawsuit as a desperate attempt

11 to distract and harass Manaflex, with the hopes that this lawsuit will somehow discredit Manaflex to

12 its customers and the industry.  Perhaps most telling of CelLink's true motives for filing this lawsuit

13 are the barebones nature of CelLink's Complaint and the fact that one of CelLink's first courses of

14 action after filing this lawsuit was to reach out to Manaflex's current and potential customers

15 informing them of the lawsuit.  Thus, Manaflex Answers CelLink's Complaint and brings

16 counterclaims as detailed below.

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

ANSWER ............................................................................................................. 5

ADDITIONAL DEFENSES .................................................................................. 9

DEMAND FOR JURY TRIAL ON CELLINK'S COMPLAINT ...................................... 11

COUNTERCLAIMS ............................................................................................ 11

I.     Introduction ......................................................................................... 11

II.    Patent Background ................................................................................ 11

       A.    CelLink's '070 Patent and Its Related Applications ............................. 11

       B.    Persons Involved with the Application Process for the '070 Patent:
             Messrs. Coakley, Brown, Yang, Miller, Lego, and Gusev ..................... 11

III.   CelLink Knows the '070 Patent Is Invalid, and that It Withheld Material
       Information from the PTO in Order to Obtain the Patent. .......................... 13

       A.    CelLink (including Mr. Coakley and Its Patent Prosecution Counsel)
             Withheld from the PTO Prior Art Disclosing What the '070 Patent
             Specification Suggests Is the Patent's Point of Novelty:  Use of a
             Temporary Substrate. ................................................................ 13

             1.    The '070 Patent Is Not Directed to the Conventional Process of
                   Patterning a Conductive Layer with an Insulator as a Base Layer. ........... 13

             2.    The '070 Patent Specification Differentiates the Patent from
                   Conventional Process by Pointing to Its Use of a Temporary
                   Substrate—Instead of a Permanent Insulator—as a Base Layer. .............. 14

             3.    CelLink (including Mr. Coakley and its Patent's Prosecution
                   Counsel) Understood at the Time of the Filing that Using a
                   Temporary Substrate as the Base Layer Was Not New. .......................... 15

             4.    Mr. Coakley and the '070 Patent's Prosecution Counsel
                   Understood at the Time of the Filing that Using a Temporary
                   Substrate as the Base Layer Was Prior Art. ..................................... 17

             5.    Although CelLink (including Mr. Coakley and its Patent
                   Prosecution Counsel) Knew of the Prior Art Disclosing the Use of
                   a Temporary Substrate as a Base Layer, They Did Not Bring any of
                   It to the PTO's Attention During the '070 Patent Application's
                   Prosecution. .......................................................................... 20

       B.    CelLink Left It to the PTO to Find Prior Art with a Temporary Substrate. .......... 21

       C.    The Prior Art that the PTO Found, However, Was Not Nearly as Relevant
             as the Prior Art CelLink Withheld ................................................. 21

             1.    The PTO Initially Rejected all of the Pending Application Claims
                   in Light of Prior Art that It Found. ............................................. 21

2. The Patent Issued Because CelLink Overcame the Rejection by Narrowing Its Claims to Require the Use of a "Metal Foil" as the Conductive Layer. ................................................................... 22

3. CelLink (including Mr. Coakley and its Patent Prosecution Counsel) Understood that Prior Art They Withheld Disclosed "Metal Foil" and Other Key Features that the PTO Believed Were Missing in the Prior Art. .......................................................... 24

D. If the PTO Had Known About the Highly Material References that CelLink (including Mr. Coakley and Patent Prosecution Counsel) Withheld, the '070 Patent Claims Would Not Have Issued. ................................ 24

1. The Withheld References Disclose the Key Features that CelLink and the PTO Found Were Missing from the Prior Art of Record. ........... 24

2. CelLink—Including at least Mr. Coakley and the Patent Prosecution Counsel—Knew that These Withheld References Were More Material than the Prior Art Before the PTO. ................................... 27

3. The Withheld References Each Anticipate One or More Claims of the '070 Patent. ..................................................................................... 27

IV. CelLink Feared Competing with Manaflex and Used the '070 Patent in an Attempt to Improperly Disrupt CelLink's Business ................................................................ 32

V. Counterclaim Causes of Action ............................................................................... 34

A. Jurisdiction and Venue ................................................................................. 34

B. Count One:  '070 Patent Invalidity ............................................................. 34

C. Count Two:  '070 Patent Unenforceability ................................................. 34

D. Count Three:  Intentional Interference with Prospective Economic Advantage ...................................................................................................... 36

E. Count Four:  Intentional Interference with Contractual Relations ...................... 37

F. Count Five:  Unfair Competition (Cal. Bus. & Prof. Code §§ 17200 *et seq.*) ................................................................................................................ 38

DEMAND FOR RELIEF ON MANAFLEX'S COUNTERCLAIMS ................................................... 39

DEMAND FOR JURY TRIAL ON MANAFLEX'S COUNTERCLAIMS ...................................... 40

## **ANSWER**

The numbered paragraphs in the Answer correspond to the numbered paragraphs in CelLink's Complaint.  Unless specifically admitted below, Manaflex denies the allegations in the Complaint.

With respect to the unnumbered introductory paragraph on page one of the Complaint, Manaflex admits that Robert Lane founded Manaflex.  Manaflex denies that CelLink brought this action for reasons other than improper purposes, such as disrupting Manaflex's business.  Manaflex denies any wrongdoing.   Manaflex has insufficient knowledge or information to form a belief as to the truth of the remaining allegations, and therefore denies the allegations.

1.    Manaflex has insufficient knowledge or information to form a belief as to the truth of these allegations, and therefore denies the allegations.

2.    Manaflex has insufficient knowledge or information to form a belief as to the truth of these allegations, and therefore denies the allegations.

3.    Denied.

4.    Manaflex has insufficient knowledge or information to form a belief as to the truth of these allegations, and therefore denies the allegations.

5.    Manaflex admits that CelLink approached Tesla in the 2010s.  Manaflex denies that CelLink has any unique product capabilities.  Manaflex has insufficient knowledge or information to form a belief as to the truth of the remaining allegations, and therefore denies the allegations.

6.    Manaflex admits that CelLink and Tesla met sometime in the 2010s, and that Robert Lane participated.  Manaflex admits that, because CelLink was claiming it could help Tesla, Mr. Lane asked CelLink how it could do so, and that CelLink did not provide any concrete answers.  Manaflex admits that no NDA was entered.  Manaflex has insufficient knowledge or information to form a belief as to the truth of the remaining allegations, and therefore denies the allegations.

7.    Manaflex admits that CelLink and Tesla communicated one or more times in the 2010s about Manaflex potentially manufacturing products for Tesla, and that Mr. Lane and Mr. Barton were involved in one or more communications.  Manaflex admits there was no NDA. Manaflex has insufficient knowledge or information to form a belief as to the truth of the remaining

ANSWER AND COUNTERCLAIMS
Case No. 4:23-cv-04231-HSG

allegations, and therefore denies the allegations.

8.     Manaflex has insufficient knowledge or information to form a belief as to the truth of these allegations, and therefore denies the allegations.

9.     Manaflex has insufficient knowledge or information to form a belief as to the truth of these allegations, and therefore denies the allegations.

10.     Manaflex admits that Mr. Lane serves as its CEO and founded Manaflex in or around August 2018.  Manaflex admits that it produces components for flexible circuits via another company in Taicang, China.

11.     Admit that Manaflex conducted R&D in Hawaii.  Admit that, as of at least the filing of the Complaint, Manaflex's website included a webpage stating that "Manaflex is headquartered in Hawaii with its R&D center; production facility in Taicang, China and Taiwan; sales team in Bay area, San Francisco."  Admit that on the Hawaii Business Registration Division webpage for Hawaii businesses, Manaflex's listed mailing address is a PO Box in Hawaii, and the "Agent Address" is a residential address that was once affiliated with Robert Lane.  Manaflex denies the remaining allegations.

12.     Admit that Robert Lane and Manaflex filed U.S. Patent Application No. 16/909,735 in June 2020.  Manaflex denies the remaining allegations.

13.     Admit that Mr. Barton joined Manaflex in December 2022 as its Director of Engineering, that Mr. Barton had previously been a Tesla employee, and that Mr. Barton met with CelLink in or around the mid-2010s.  Manaflex denies that Mr. Barton toured a factory floor, and it denies that Mr. Barton observed and accessed several CelLink manufacturing techniques.  Manaflex has insufficient knowledge or information to form a belief as to the truth of the remaining allegations, and therefore denies the allegations.

14.     Manaflex has insufficient knowledge or information to form a belief as to the truth of these allegations, and therefore denies the allegations.

15.     Manaflex denies that it misappropriated any trade secrets, and it denies that it "is only able to offer its products because Manaflex misappropriated CelLink's trade secrets."  Manaflex has insufficient knowledge or information to form a belief as to the truth of the remaining allegations,

1  and therefore denies the allegations.

2          16.    Manaflex has insufficient knowledge or information to form a belief as to the truth of

3  what CelLink believes.  Manaflex denies the remaining allegations.

4          17.    Manaflex has insufficient knowledge or information to form a belief as to the truth of

5  the allegations, and therefore denies the allegations.

6          18.    Admit that Manaflex is a Limited Liability Company organized in Hawaii.  Admit

7  that it had a place of business in Hawaii.  Admit that Robert Lane is listed as its agent with an Agent

8  Address of 68-3527 Haena St., Waikoloa, Hawaii 96738, United States.

9          19.    Admit that CelLink purports to bring this action under the patent laws of the United

10  States, including 35 U.S.C. § 271 *et seq.* and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §

11  1836 *et seq.*

12          20.    Admit that CelLink purports to bring this action under the patent laws of the United

13  States, including 35 U.S.C. § 271 *et seq.* and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §

14  1836 *et seq.*; and if so and if its allegations concerning interstate commerce are accurate, that this

15  Court has subject matter jurisdiction for those claims.  Manaflex has insufficient knowledge or

16  information to form a belief as to the truth of whether the "trade secrets at issue relate to CelLink's

17  products that are used in interstate commerce, per 18 U.S.C. § 1836(b)(1)," and therefore denies the

18  allegation.

19          21.    Manaflex denies that it has committed acts of infringement or trade secret

20  misappropriation in this District.  The remaining allegation set forth legal conclusions to which no

21  response is required.

22          22.    Manaflex denies that it has committed acts of infringement or trade secret

23  misappropriation in this District.  The remaining allegation set forth legal conclusions to which no

24  response is required.

25          23.    Admit that a document that appears to be the '070 patent was attached to the

26  Complaint and that it is entitled, "Interconnect Circuit Methods and Devices."  Manaflex denies the

27  remaining allegations.

28          24.    Manaflex has insufficient knowledge or information to form a belief as to the truth of

1  these allegations, and therefore denies the allegations.

2      25.    Manaflex admits that this paragraph of the Complaint appears to have reproduced the

3  language recited in claim 1 of the '070 patent.  Manaflex admits that the claim purports to recite a

4  "method of forming an interconnect circuit…."  Manaflex has insufficient knowledge or information

5  to form a belief as to whether the methods recited in the claims of the patent are "used in many

6  applications, including battery packs and solar arrays, vehicles, light fixtures, and many other types

7  of electrical and electronic circuits," and therefore denies those allegations.  Manaflex denies the

8  remaining allegations.

9      26.    Manaflex incorporates by reference its answers to the preceding paragraphs.

10     27.    Denied.

11     28.    Manaflex has insufficient knowledge or information to form a belief as to the truth of

12  what CelLink believes, and therefore denies that allegation.  Manaflex denies any remaining

13  allegations.

14     29.    Denied.

15     30.    Manaflex admits that it has made flexible circuit components.  Manaflex denies the

16  remaining allegations, including that Figure 5 is representative of its processes.

17     31.    Denied, including that Figure 5 is representative of the processes.

18     32.    Denied, including that Figure 5 is representative of the processes.

19     33.    Denied, including that Figure 5 is representative of the processes.

20     34.    Denied, including that Figure 5 is representative of the processes.

21     35.    Denied.

22     36.    Denied.

23     37.    Denied.

24     38.    Manaflex incorporates by reference its answers to the preceding paragraphs.

25     39.    Manaflex has insufficient knowledge or information to form a belief as to the truth of

26  these allegations, and therefore denies the allegations.

27     40.    Manaflex has insufficient knowledge or information to form a belief as to the truth of

28  these allegations, and therefore denies the allegations.

41.     Manaflex denies that Messrs. Lane or Barton used any information other than what they contributed independently of CelLink.  Manaflex has insufficient knowledge or information to form a belief as to what CelLink contends Messrs. Lane and Barton received, what CelLink contends its trade secrets are, and the terms of the MNDA, and therefore denies these allegations.  Manaflex denies the remaining allegations.

42.     Manaflex denies that Messrs. Lane or Barton used any information other than what they contributed independently of CelLink.  Manaflex has insufficient knowledge or information to form a belief as to what CelLink contends Messrs. Lane and Barton received, what CelLink contends its trade secrets are, and what techniques are called out in CelLink's August 2016 email, and therefore denies these allegations.  Manaflex denies the remaining allegations.

43.     Denied.

CelLink's Prayer For Relief:  Manaflex denies that CelLink is entitled to any of the requested relief.

## ADDITIONAL DEFENSES

Manaflex pleads these additional and/or affirmative defenses.  Not all of these defenses are affirmative defenses; some go to issues on which CelLink bears the burden of proof for its affirmative case.

### 1.  Invalidity

The asserted claims of the '070 patent are invalid under the Patent Act, 35 U.S.C. §§ 1 *et seq.*, including under sections 102 (anticipation), 103 (obviousness), 112 (specification), and for not listing the correct inventors (sections 101, 116, 256).  Manaflex incorporates by reference each of the paragraphs in its Counterclaims.

### 2.  Unenforceability Due to Inequitable Conduct

The patent is unenforceable under the doctrine of inequitable conduct.  Bases for this defense are included in the Counterclaims below, which are incorporated herein by reference.

### 3.  Unenforceability Under the Doctrine of Unclean Hands

CelLink is barred from bringing this sue under the doctrine of unclean hands.  Bases for this defense are included in the Counterclaims below, which are incorporated herein by reference.

### 4. Prosecution History Estoppel

To the extent CelLink ever attempts to assert infringement under the doctrine of equivalents of its asserted claim 1, it will be estopped from asserting so with respect to at least the following limitations:

- wherein the conductive layer is a metal foil, comprising a first side and a second side, opposite of the first side, and having a constant thickness;

- wherein the substrate comprises an adhesive layer, laminated to the second side of the conductive layer;

- wherein the substrate maintains orientation of the first conductive portion relative to the second conductive portion after patterning the conductive layer;

- after patterning the conductive layer, laminating a first insulator to the first side of the conductive layer; and

- after laminating the first insulator to the first side of the conductive layer, removing the substrate from the conductive layer.

### 5. Readily Ascertainable and Insufficiently Protected

CelLink's Complaint does not describe the trade secrets and Manaflex reserves the right to amend or revise this defense, but based on CelLink's allegations (as best as they can be understood), its alleged trade secrets are not trade secrets, they are readily ascertainable, and CelLink insufficiently protected them (*e.g.*, by including concepts in its patent applications that became available to the public).

### 6. Independently Developed

Manaflex did not misappropriate any trade secrets, and instead independently developed its technology.

### 7. Statute of Limitations

CelLink's Complaint does not describe the trade secrets, so out of an abundance of caution Manaflex reserves the right to assert—and therefore hereby asserts—that CelLink's claims are barred under the statute of limitations.

### 8. Failure to State a Claim

CelLink's Complaint fails to state one or more claims for which relief can be granted.

**DEMAND FOR JURY TRIAL ON CELLINK'S COMPLAINT**

Manaflex demands a jury trial on all issues triable by jury.

**COUNTERCLAIMS**

Manaflex brings these allegations based on knowledge and/or information and belief.

**I.    Introduction**

1.    CelLink's patent infringement lawsuit against Manaflex was filed for the improper purpose of disrupting Manaflex's business.

2.    In that lawsuit, CelLink accuses Manaflex of infringing U.S. Patent No. 11,116,070 ("'070"), which CelLink fraudulently obtained by deceiving the United States Patent & Trademark Office ("USPTO" or "PTO") about the state of the art of prior manufacturing processes.

3.    During the application process for the '070 patent, CelLink withheld prior art from the PTO that it knew disclosed the very subject matter claimed in that patent.

4.    CelLink—including at least its CEO and patent prosecution counsel—know that the asserted claim (along with other claims) of the '070 patent is invalid and should never have issued, and CelLink has asserted the patent for the improper purpose of harming Manaflex's business, including its relationships with its customers.

5.    CelLink's claims are objectively baseless and asserted in subjective bad faith.

**II.    Patent Background**

**A.    CelLink's '070 Patent and Its Related Applications**

6.    The '070 patent is entitled, "Interconnect Circuit Methods and Devices."  It issued on September 7, 2021.  And the nonprovisional application that issued into that patent was filed on July 13, 2018 ("'070 application" or "'070 patent's application").  The cover of the '070 patent lists as a "Related" provisional application, Provisional application No. 62/531,995, which was filed on July 13, 2017 ("provisional application").

**B.    Persons Involved with the Application Process for the '070 Patent: Messrs. Coakley, Brown, Yang, Miller, Lego, and Gusev.**

7.    The persons listed as the named inventors of the '070 patent are Kevin Michael Coakley, Malcolm Parker Brown, Dongao Yang, Michael Lawrence Miller, and Paul Henry Lego

(collectively, "named inventors").

8. In March through April 2019, four of the named inventors—Messrs. Coakley, Brown, Yang, and Lego — signed declarations that were submitted to the PTO in May 2020. In each declaration, the named inventors swore: "I believe that I am the original joint inventor of a claimed invention in the application." As described in more detail below, one or more of these declarations were knowingly false, as Mr. Coakley understood that others had invented the claims of the patent, and one or more of the other inventors could not possibly have believed they had any contribution to any claim of the patent's application.

9. Mr. Coakley is a named inventor of several other CelLink patents and pending patent applications. He is also CelLink's CEO.

10. Prosecution counsel for the patent application that issued as the '070 patent was Vladimir Gusev of Kwan & Olynick. Mr. Gusev and/or Kwan & Olynick were granted power of attorney to communicate with the PTO about that patent application. In 2022—after the '070 patent issued—the power of attorney for the '070 patent was revoked, and a new power of attorney was issued for patent practitioners associated with the following customer number: 188603. That customer number corresponds to Polygon IP, LLC, which Mr. Gusev founded. Mr. Gusev still has power of attorney with respect to the '070 patent.

11. Mr. Gusev has prosecuted—and still prosecutes—patent applications for CelLink. Mr. Gusev has been the prosecution counsel for several patent applications that name Mr. Coakley as the inventor. Mr. Gusev's clients during the prosecution of the '070 patent application included CelLink and Mr. Coakley.

12. Mr. Gusev regularly updated CelLink and Mr. Coakley concerning communications with the PTO about the '070 patent application, including by providing electronic or paper copies of the written communications with the PTO. And it was his practice to do the same—*i.e.*, update CelLink and Mr. Coakley about PTO communications—with respect to other patent application he was prosecuting for CelLink that named Mr. Coakley as an inventor.

**III.    CelLink Knows the '070 Patent Is Invalid, and that It Withheld Material Information from the PTO in Order to Obtain the Patent.**

**A.    CelLink (including Mr. Coakley and Its Patent Prosecution Counsel) Withheld from the PTO Prior Art Disclosing What the '070 Patent Specification Suggests Is the Patent's Point of Novelty:  Use of a Temporary Substrate.**

**1.    The '070 Patent Is Not Directed to the Conventional Process of Patterning a Conductive Layer with an Insulator as a Base Layer.**

13.    The '070 patent is directed to a particular way of forming an interconnect circuit by, among other things, patterning a conductive layer (a metal foil) that was laminated onto a substrate. Figure 5A from the patent (reproduced below), illustrates an example of a conductive layer (210) that has been patterned while laminated to a substrate (220).



14.    By patterning and removing portions of the conductive layer, the remaining portions of the conductive layer can be formed into a circuit.

15.    The '070 patent claims, however, do not cover all such methods.  For example, the '070 patent claims do not cover methods of forming interconnect circuits that use a permanent insulator as a base layer against which patterning takes place.

16.    Indeed, the '070 patent states that "in conventional processes, an insulator is used as a base layer against which etching takes place."  ('070 patent at 5:60-62 (emphasis added).)

17.    Using an insulator as a base layer against which etching takes place was a conventional process before the filing of the filing of the '070 patent's provisional application.  And before the July 13, 2017, provisional application filing date, the named inventors understood that using an insulator as a base layer against which etching takes place was a conventional process.

18.    Mr. Coakley, for example, understood that for many years prior to that filing, others

had manufactured circuits by using an insulator as a base layer on which a conductor could be

etched.

**2.      The '070 Patent Specification Differentiates the Patent from Conventional Process by Pointing to Its Use of a Temporary Substrate—Instead of a Permanent Insulator—as a Base Layer.**

19.    The '070 patent purports to disclose "new patterning" and other techniques/processes

that differ from this conventional process.

20.    Among the supposed new techniques is using a temporary substrate instead of a

permanent insulating layer on which to perform the etching.  ('070 patent at 2:26-28, 5:9-37.)  In

particular, a substrate is used for support while the conductive layer is being patterned.  (Id.)  Figure

5A (below) of the '070 patent illustrates an example of a conductive layer (210) that has been

patterned while laminated to a substrate (220).



FIG. 5A

21.    Among the supposed new techniques introduced by the '070 patent is leaving the

substrate attached to the patterned conductive layer until after an insulator is laminated to the

patterned conductive layer.  ('070 patent at 5:9-37.)  So, using Figure 5A of the patent as an example,

an insulator is laminated on the exposed side of conductor 210.

22.    The '070 patent discloses that, after the insulator is laminated to the conductive layer,

the substrate can be "later removed"—or it can "remain as a part of the final interconnect circuit…."

('070 patent at 5:31-37.)  The '070 patent claims are all directed to the former disclosure:  removing

the substrate after an insulator is laminated to the conductive layer.  Independent claim 1 of the '070

patent—which is the patent's sole independent claim—recites "removing the substrate from the

conductive layer" after laminating a "first insulator to the first side of the conductive layer…."  ('070

patent, claim 1.)

23.     One supposed advantage of this technique disclosed in the '070 patent is the following:  "Because this permanent insulator is not present while patterning the conductive layer is performed and therefore is not susceptible to damage during patterning, new techniques may be used for patterning without any concerns about damaging the permanent insulator."  ('070 patent at 5:17-21.)

### 3.     CelLink (including Mr. Coakley and its Patent's Prosecution Counsel) Understood at the Time of the Filing that Using a Temporary Substrate as the Base Layer Was Not New.

24.     One of more of the inventors (and patent prosecution counsel), however, understood that none of the techniques described in the previous subsection were new.

25.     For example, before July 13, 2017, Mr. Coakley (one of the named inventors), and Mr. Gusev (patent prosecution counsel) understood that others had conceived of—and published— the idea of patterning a conductive layer laminated to a temporary substrate.

26.     For example, they were aware of a 2013 international patent publication WO2013063738A1, to E. I.  Du Pont De Nemours and Company ("DuPont"), which discloses patterning a conductive layer that has been laminated to a temporary substrate.

27.     The DuPont reference was published on or about May 10, 2013.  And its international filing date is October 31, 2011.

28.     The DuPont reference discloses patterning a conductive layer (a conductive "metal foil") while the conductive layer is attached to a temporary substrate (called a "transfer sheet"), which includes an adhesive.  (DuPont reference at pp. 16, 30-35.)[1] The "die-cutting" can be done by a blade or by "laser cutting."  (DuPont at p. 9:3-7.)  As illustrated in Figure 3 of the DuPont reference, the die-cutting results in slits/openings being formed in the conductive metal foil 33.  (p. 15:8-29; see also at p. 30:26-30; p. 32:9-13; p. 33:26-30.)

29.     As illustrated below, both CelLink's '070 patent and the DuPont reference disclose patterning a conductive layer.

---

[1] References to "page," "pages," "p.," or "pp.," numbers in the DuPont reference are to the numbered pages at the bottom of the pages.  If the cite includes line numbers, the line numbers will follow the page number with a colon (*e.g.*, page 1, lines 1-10 would be cited as "p. 1:1-10").

**'070 Patent, Figure 5A**             **DuPont Fig. 3**



30.     As illustrated below, both the CelLink '070 patent and the DuPont reference disclose that the patterning forms first and second portions of the conductive layer (the "First Conductive Portion" and "Second Conductive Portion" labels and arrows were added to DuPont Fig. 4b for illustration purposes).

**'070 Patent, Figure 5B**             **DuPont Fig. 4b**



31.     Both the CelLink '070 patent and the DuPont reference disclose that—after the patterning—an insulator is laminated on the conductive layer.  ('070 patent at 13:25-27; DuPont at pp. 16:18-20, 30:31-31:4, 32:15-22-34:1-7.)

32.     Finally, both the CelLink '070 patent and the DuPont reference disclose that—after laminating the insulator—the temporary substrate (which the DuPont reference refers to as a "transfer sheet") is removed.  ('070 patent at 1:62-2:3; 5:32-37; DuPont at pp. 16:24-28, 31:4-12, 32:22-30, 34:7-15.)

33.     In 2015, one of more people with substantive involvement in the prosecution of the '070 patent application became aware of the DuPont reference.

34.     In a communication dated August 31, 2015, the PTO rejected claims in patent application number 13/663,273 in light of the DuPont reference.  That application is a different

patent application than the one that issued into the '070 patent (it is a prior patent application). Application No. 13/663,273 is a patent application that names Mr. Coakley as an inventor and was assigned to CelLink.  As in the '070 patent, Mr. Gusev was the patent prosecution counsel for the application.

35.     Mr. Gusev and Mr. Coakley received the communication from the PTO dated August 31, 2015 (in Application No. 13/663,273).  In the August 31, 2015, communication, the PTO identified the DuPont reference, including its use of a laminated metal foil as a conductive layer.

36.     In 2015, at least Mr. Gusev and Mr. Coakley became aware of the DuPont reference, and its disclosure of a temporary substrate ("transfer sheet") and a metal foil.

> **4.     Mr. Coakley and the '070 Patent's Prosecution Counsel Understood at the Time of the Filing that Using a Temporary Substrate as the Base Layer Was Prior Art.**

37.     At the time of the filing of the '070 patent's application, Mr. Gusev and Mr. Coakley understood that patterning a conductive layer on a temporary substrate in order to form a circuit was prior art.

38.     For example, the DuPont reference (discussed above) is prior art to the '070 patent. The'070 patent's nonprovisional application was filed on July 13, 2018.  The provisional application was filed on July 13, 2017.  In contrast, the DuPont reference was published in 2013—several years prior to the effective filing date of the '070 patent.

39.     During the prosecution of the '070 patent's application, Mr. Gusev understood that the DuPont reference was prior art to the '070 patent's application.

40.     During the prosecution of the '070 patent's application, Mr. Coakley understood that the DuPont reference was prior art to the '070 patent's application.

41.     During the prosecution of the '070 patent's application, Mr. Gusev and Mr. Coakley also understood there was other prior art to the '070 patent's application that disclosed patterning a conductive layer that had been laminated to a temporary substrate.

42.     One example of such prior art that they were aware of was U.S. Patent Application Publication No. 2013/0112233 A1.  That patent application publication names Mr. Coakley as an inventor, it was assigned to CelLink, and Mr. Gusev was patent prosecution counsel for it.  That

1  patent application publication bears a publication date of May 9, 2013.  The publication will be

2  referred to in this Answer and Counterclaim as the "2013 Coakley Publication" or "Coakley's 2013

3  Publication."

4       43.    The 2013 Coakley Publication is prior art to the '070 patent.

5       44.    Among other things, the 2013 Coakley Publication discloses:

6            a.    A temporary substrate, which the 2013 Coakley Publication refers to as a

7  "temporary carrier."

8            b.    A conductive layer, which the 2013 Coakley Publication refers to as a

9  "conductive foil," and which it discloses can come from a roll or sheet and be a metal, such

10  as aluminum.

11            c.    Laminating the conductive layer to the temporary carrier.

12            d.    Patterning the conductive layer while it is laminated to the temporary carrier.

13            e.    Laminating an insulator to a side of the conductive layer while the other side

14  of the conductive layer is still laminated to the temporary carrier.

15            f.    After laminating the insulator to the conductive layer, removing the temporary

16  carrier.

17       45.    Coakley's 2013 Publication includes a claim reciting these features.  The claim is

18  claim 27, and it is similar to claim 1 of the '070 patent.  Claim 1 of the '070 patent and claim 27 of

19  Coakley's 2013 Publication are reproduced below:

| '070 Patent, Claim 1 | 2013 Coakley Publication, Claim 27 |
|---|---|
| 1. A method of forming an interconnect circuit, the method comprising: | 27. A method of fabricating an interconnect circuit comprising: |
| laminating a substrate to a conductive layer, wherein the conductive layer is a metal foil, comprising a first side and a second side, opposite of the first side, and having a constant thickness, and<br>wherein the substrate comprises an adhesive layer, laminated to the second side of the conductive layer; | in a first lamination step, laminating a conductive foil to a temporary carrier substrate comprising a low-tack adhesive; |
| patterning the conductive layer, while the conductive layer remains laminated to the substrate,<br>wherein patterning the conductive layer forms a | kiss cutting a pattern of interdigitated fingers into the conductive foil; |

| '070 Patent, Claim 1 | 2013 Coakley Publication, Claim 27 |
|---|---|
| first conductive portion and a second conductive portion of the conductive layer, at least partially separated from the first conductive portion, wherein the substrate maintains orientation of the first conductive portion relative to the second conductive portion after patterning the conductive layer; | |
| after patterning the conductive layer, laminating a first insulator to the first side of the conductive layer; and | forming a high-tack patterned adhesive layer on an insulating layer, wherein the pattern in the adhesive layer at least partially matches the pattern of interdigitated fingers in the conductive foil; in a second lamination step, laminating the exposed surface of the conductive foil to the insulating layer via the patterned adhesive layer, wherein the patterned adhesive layer is aligned with the kiss cut pattern of interdigitated fingers; and |
| after laminating the first insulator to the first side of the conductive layer, removing the substrate from the conductive layer, wherein the first insulator maintains the orientation of the first conductive portion relative to the second conductive portion after the substrate is removed | peeling away the temporary carrier substrate and undesired regions of conductive foil. |

46.     Mr. Coakley, Mr. Gusev, and possibly other persons involved in the '070 patent application's prosecution, were aware of this claim 27—and of the contents of Coakley's 2013 Publication—during the prosecution of the '070 patent's application.

47.     Claim 27 of the 2013 Coakley Publication was included in the October 29, 2012, filing of U.S. Patent Application No. 13/663,273, which is the application that was published as the 2013 Coakley Publication.

48.     On December 7, 2012, Mr. Coakley signed a declaration that he was an inventor of U.S. Patent Application No. 13/663,273, and that: "I have reviewed an understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above." That declaration was submitted to the PTO in or about January 2013.

49.     At the time Mr. Coakley signed that declaration, he had reviewed and understood the contents of the specification, including the claims, in U.S. Patent Application No. 13/663,273.

50.     Application claim 27 remained in U.S. Patent Application No. 13/663,273 until around April 2014.  Mr. Gusev was the patent prosecution counsel for that application as of April 2014:  in March 2014, Mr. Gusev signed a power-of-attorney form that was submitted to the PTO in that application; and in March 2014, he and/or his law firm at the time, Kwan & Olynick LLP, had been granted power of attorney for that application.

51.     In April 2014, Mr. Gusev submitted one or more papers to the PTO for that patent application (Appl. No. 13/663,273).  In one or more of those papers, Mr. Gusev canceled application claim 27—the claim directed to the temporary carrier substrate.  In cancelling that claim, Mr. Gusev communicated to the PTO the following:  "The foregoing amendments to the application have been made in order to bring the application into compliance with Patent Office formalities and are in no way intended to alter the scope of the application as filed."  (4/25/14 Preliminary Amendment at p. 8.)

**5.      Although CelLink (including Mr. Coakley and its Patent Prosecution Counsel) Knew of the Prior Art Disclosing the Use of a Temporary Substrate as a Base Layer, They Did Not Bring any of It to the PTO's Attention During the '070 Patent Application's Prosecution.**

52.     Mr. Coakley, CelLink's patent prosecution counsel (including Mr. Gusev), and the other named inventors understood they had a duty to disclose material information to the PTO.  Mr. Coakley was a named inventor on many patents—he well understood that duty.  For example, in U.S. Patent Application No. 13/663,273 (discussed above), Mr. Coakley signed a declaration stating:  "I acknowledge the duty to disclose information which is material to patentability as defined in 37 CFR § 1.56."

53.     As of the filing of the application for the '070 patent—and throughout its prosecution—the DuPont reference and the 2013 Coakley Publication were material prior art references.

54.     Although by 2017 Mr. Gusev and Mr. Coakley (and possibly others at CelLink) knew of the DuPont reference and the 2013 Coakley Publication—and that the references included a highly material disclosure of patterning a conductive layer while it was laminated to a temporary substrate—they did not disclose them to the PTO during the '070 patent's application process.

**B.     CelLink Left It to the PTO to Find Prior Art with a Temporary Substrate.**

55.     The PTO, however, found a prior art reference that it contended disclosed the use of a temporary substrate, and it applied that reference as a primary reference to reject the '070 patent application's claims.  The reference was U.S. Publication 2015/0201489 to Foong et al ("Foong"), which the PTO cited on January 21, 2021—a little over 2-1/2 years after the '070 patent's nonprovisional application was filed.

**C.     The Prior Art that the PTO Found, However, Was Not Nearly as Relevant as the Prior Art CelLink Withheld.**

**1.     The PTO Initially Rejected all of the Pending Application Claims in Light of Prior Art that It Found.**

56.     In an Office Action dated January 21, 2021 ("Office Action"), the PTO rejected the claims that were then pending in the '070 patent's application, including based on the grounds that the claims were obvious under 35 U.S.C. § 103 in light of:  (1) Foong; (2) U.S. Patent No. 4,751,126 to Oodaira ("Oodaira"); and (3) U.S. Publication 2007/0034401 to Shim ("Shim").  In particular, the PTO rejected then-pending application claims 1-4 as unpatentable under 35 U.S.C. § 103 in light of Foong and Oodaira; and the PTO rejected then-pending application claim 16 as unpatentable under 35 U.S.C. § 103 in light of Foong, Oodaira, and Shim.

57.     In that Office Action, the PTO also included a few statements about features that Foong does not teach, including that, "Foong does not teach that the first insulator is laminated to *the first [top] side* of the patterned conductive layer [as required by Claim 1], and that the first insulator includes an opening *prior to* laminating [as required by Claim 2]."  (Office Action at p. 6 (emphasis in original).)

58.     Those features that the PTO found was missing from Foong are limitations in issued claims in the '070 patent.  Claim 1 of the '070 patent recites, among other things, "laminating a first insulator to the first side of the conductive layer…."  And claim 2 of the ''070 patent recites, among other things, "the first insulator comprises an opening prior to laminating…."

59.     In that Office Action, the PTO also found that Foong did not disclose the following limitation in application claim 16 (which is also found in claim 16 of the '070 patent): "wherein

-21-

patterning the conductive layer comprises a process selected from the group consisting of chemical

etching, electrochemical etching, mechanical cutting, laser cutting, and laser ablation."

60.     Instead, the PTO stated that "Foong patterns the conductive layer through deposition

and sintering."  (Office Action at p. 7.)

61.     As a result, for application claim 16, the PTO pointed to another reference—Shimm—

for a disclosure of patterning the conductive layer by chemical etching.  (*Id.*)

62.     Thus, although in the Office Action the PTO rejected application claim 16 under 35

U.S.C. § 103, it relied on the combination of three references to do so (Foong, Oodaira, and Shimm).

> **2.     The Patent Issued Because CelLink Overcame the Rejection by Narrowing Its Claims to Require the Use of a "Metal Foil" as the Conductive Layer.**

63.     In response to the Office Action, CelLink narrowed its claims and made a few

arguments about why the claims distinguished the prior art:  including because the prior art lacked a

disclosure of the use of a "metal foil" as a conductive layer.

64.     On March 29, 2021, Mr. Gusev (on behalf of CelLink) emailed Dexter Tugbang, a

PTO examiner working on the examination of the '070 patent's application.  The email included the

following potential amendment to application claim 1:

> 1. (Currently Amended) A method of forming an interconnect circuit, the method comprising:
>    **laminating** a substrate to a conductive layer,
>       wherein the conductive layer is a metal foil, comprising comprises a first side and a
>       second side, opposite of the first side, and having a constant thickness, and
>       wherein the substrate comprises an adhesive layer, [[is]] laminated to the second side of
>       the conductive layer;
>    **patterning** the conductive layer, while the conductive layer remains laminated to the substrate,
>       wherein patterning the conductive layer forms a first conductive portion and a second
>       conductive portion of the conductive layer, at least partially separated from the first conductive
>       portion,
>       wherein the substrate maintains orientation of the first conductive portion relative to
>       the second conductive portion after patterning the conductive layer;
>    after patterning the conductive layer, **laminating** a first insulator to the first side of the conductive layer; and
>    after laminating the first insulator to the first side of the conductive layer, **removing** the substrate from the
>    conductive layer,
>       wherein the first insulator maintains the orientation of the first conductive portion
>       relative to the second conductive portion after the substrate is removed.

65.     On March 31, 2021, Mr. Gusev had a phone conversation with the PTO—in particular, patent examiner Tugbang, who was examining the '070 patent's application.  They discussed the proposed amendment.

66.     That same day, in a written Response to Office Action electronically signed by Mr. Gusev, CelLink amended application claim 1 as follows:

> 1. (Currently Amended) A method of forming an interconnect circuit, the method comprising:
>
> laminating a substrate to a conductive layer,
>
> wherein the conductive layer is a metal foil, comprising comprises a first side and a second side, opposite of the first side, and having a constant thickness, and
>
> wherein the substrate comprises an adhesive layer, [[is]] laminated to the second side of the conductive layer;
>
> patterning the conductive layer, while the conductive layer remains laminated to the substrate,
>
> wherein patterning the conductive layer forms a first conductive portion and a second conductive portion of the conductive layer, at least partially separated from the first conductive portion,
>
> wherein the substrate maintains orientation of the first conductive portion relative to the second conductive portion after patterning the conductive layer;
>
> after patterning the conductive layer, laminating a first insulator to the first side of the conductive layer; and
>
> after laminating the first insulator to the first side of the conductive layer, removing the substrate from the conductive layer,
>
> wherein the first insulator maintains the orientation of the first conductive portion relative to the second conductive portion after the substrate is removed.

67.     According to Mr. Gusev, during the March 31, 2021, telephone call, an agreement was reached that the above amendment to application claim 1 would overcome all outstanding 35 U.S.C. 112(b) and 35 U.S.C. 103 rejections, subject to further search and consideration.  (*See* 3/31/21 Response to Office Action at p. 6.).

68.     According to Mr. Gusev's summary of the March 31, 2021, telephonic interview with the examiner of the '070 patent application, (*see* 4/5/2021 Interview Summary):

> In reviewing the proposed amendment to Claim 1, the examiner considered the amendment to be favorable in that it appears to overcome the rejections under 35 U.S.C. 112(b) and 103.  The features of the conductive layer as a metal foil, and that the substrate comprises an adhesive layer, do not appear to be taught by the primary reference of Foong.

69.     On July 20, 2021, the PTO mailed a Notice of Allowance to prosecution counsel for

-23-

the '070 patent's application, indicating, among other things, that the application "has been examined and is allowed for issuance as a patent."  That same day, the PTO mailed a Notice of Allowability, which on page 3 included a section entitled, "Reasons for Allowance."  In that section, the PTO stated, among other things:

> The comments in the Telephone Interview (dated April 5, 2021) are hereby repeated and fully incorporated by reference herein.
>
> In addition to these comments, the examiner notes that in regards to the merits of Foong (as applied to Claim 1 in the previous office action), Foong does not teach that the conductive layer (104, in Fig. 1) is a metal foil.  The conductive layer is formed from a powder that is deposited onto the substrate (e.g. ¶ [0039]).  Therefore at a minimum, Foong as well as the prior art of record, do not meet the limitations of "laminating a substrate…having a constant thickness" (lines 2-4 of Claim 1).

70.     On September 7, 2021, the '070 patent issued.  The patent's claim 1 is worded the same as application claim 1, as amended in the March 31, 2021, Response.

### 3. CelLink (including Mr. Coakley and its Patent Prosecution Counsel) Understood that Prior Art They Withheld Disclosed "Metal Foil" and Other Key Features that the PTO Believed Were Missing in the Prior Art.

71.     As described below, CelLink—including at least Mr. Coakley and its patent prosecution counsel (*e.g.*, Mr. Gusev)—understood that the features the PTO believed were missing from the prior art of record were disclosed in the withheld DuPont reference and the withheld 2013 Coakley Publication.

### D. If the PTO Had Known About the Highly Material References that CelLink (including Mr. Coakley and Patent Prosecution Counsel) Withheld, the '070 Patent Claims Would Not Have Issued.

### 1. The Withheld References Disclose the Key Features that CelLink and the PTO Found Were Missing from the Prior Art of Record.

72.     The PTO found that the prior art of record in the prosecution of the '070 patent's application—in particular, Foong—disclosed, among other things, patterning a conductive layer while the conductive layer remains laminated to a substrate, laminating an insulator to the patterned conductive layer, and then removing the substrate from the patterned conductive layer.

73.     CelLink did not dispute that Foong disclosed these features.

74.     According to CelLink and the PTO, however, claim 1 of the '070 patent was

patentable over the Foong reference—and the prior art combinations—because Foong does not teach, or appear to teach, at least the following feature: a conductive layer that is a metal foil.

75. But both the DuPont reference and the 2013 Coakley Publication disclose a conductive layer that is a metal foil—and that the metal foil is laminated to a substrate.

a. The DuPont reference discloses, among other things, that a substrate (a "transfer sheet") laminated to "metal foil 33." (DuPont at p. 16:6-8; p. 30:20-24; p. 32:3-7; p. 33:20-24; p. 36:24-26.)

b. The 2013 Coakley Publication discloses, among other things, a conductive "foil" that can be a metal, such as aluminum. (¶22; *see also* claim 17 in the Publication.) The foil can come from a "roll or sheet." (¶94; *see also* claim 17 in the Publication.) The metal foil is laminated to a ""temporary carrier substrate." (¶94; *see also* claim 17 in the Publication.)

76. According to CelLink and the PTO, Foong (the primary reference) also does not appear to teach "that the substrate comprises an adhesive layer…" (4/5/2021 Interview Summary; *see also* 7/20/21 Reasons for Allowance ("The comments in the Telephone Interview (dated April 5, 2021) are hereby repeated and fully incorporated by reference herein.").)

77. But both the DuPont reference and the 2013 Coakley Publication disclose a substrate that includes an adhesive layer.

a. The DuPont reference discloses, among other things, a substrate (referred to as a "transfer sheet") that is "coated with a pressure sensitive adhesive…" (DuPont at p. 16.)

b. The 2013 Coakley Publication discloses, among other things, "laminating a conductive foil to a temporary carrier substrate comprising a low-tack adhesive," and "temporary carrier substrate 510," which includes a "temporary or low-tack adhesive" used to attach the foil 500 to the carrier substrate 510. (2013 Coakley Publication at claim 27 and ¶94.)

78. The PTO also found that "Foong does not teach that the first insulator is laminated to *the first [top] side* of the patterned conductive layer [as required by Claim 1], and that the first insulator includes an opening *prior to* laminating [as required by Claim 2]." (Office Action at p. 6

-25-

1  (emphasis in original).)

2      79.     But both the DuPont reference and the 2013 Coakley Publication disclose laminating

3  a first insulator to the first [top] side of a patterned conductive layer.  (DuPont at p. 16:12-20, p.

4  30:31-p. 31:4; p. 32:15-22.; p. 34:1-7; 2013 Coakley Publication at ¶100 and claim 27.)  And the

5  2013 Coakley Publication discloses that the first insulator includes an opening prior to laminating.

6  (¶103; *see also* ¶63.)

7      80.     With respect to claim 16 of the '070 patent—which recites, the "method of claim 1,

8  wherein patterning the conductive layer comprises a process selected from the group consisting of

9  chemical etching, electrochemical etching, mechanical cutting, laser cutting, and laser ablation"—the

10  PTO did not find that Foong included this limitation.  Instead, the PTO stated that "Foong patterns

11  the conductive layer through deposition and sintering."  (Office Action at p. 7.)  As a result, for

12  application claim 16, the PTO pointed to another reference—Shimm—for a disclosure of patterning

13  the conductive layer by chemical etching.  (*Id.*)

14      81.     But both the DuPont reference and the 2013 Coakley Publication disclose this

15  limitation from claim 16:  "patterning the conductive layer" with "a process selected from the group

16  consisting of chemical etching, electrochemical etching, mechanical cutting, laser cutting, and laser

17  ablation."

18          a.      For example, the DuPont reference discloses, among other things, "'die-cut'

19      and 'die-cutting,'" which as used in the DuPont reference refers "to a manufacturing process

20      wherein one or more blades of a desired shape slice through one or more layers of a material

21      such as wood, plastic, paper, metal or fabric to produce cut shapes of material, and includes

22      die-cutting done on flat, rotary or multiple-step presses, as well as by laser cutting."  (DuPont

23      at p. 9:3-7.)

24          b.      The 2013 Coakley Publication discloses, among other things, "flat bed kiss

25      cutting, rotary kiss cutting, water jet kiss cutting, or laser kiss cutting may be used to kiss cut

26      the layer stack."  (¶95.)

27      82.     The DuPont reference and the 2013 Coakley Publication are each more relevant and

28  material to the patentability and validity of the '070 patent claims than any of the prior art of record

in the '070 patent application examination.  Aside from disclosing features that the PTO did not believe were disclosed in the prior art of record, the DuPont reference and the 2013 Coakley Publication each would have resulted in the PTO relying on less references to reject the patent claims (e.g., claim 1 and claim 16).  And, as described below, the DuPont reference and the 2013 Coakley Publication render each of the '070 patent's claims invalid as anticipated or obvious.

> **2.      CelLink—Including at least Mr. Coakley and the Patent Prosecution Counsel—Knew that These Withheld References Were More Material than the Prior Art Before the PTO.**

83.      During the prosecution of the '070 patent's application, CelLink—including at least Mr. Coakley and its patent prosecution counsel (*e.g.*, Mr. Gusev)—knew that highly-relevant prior art was not brought before the PTO.

84.      They knew of uncited prior art that included the very claim limitations that the PTO contended were missing from the prior art that was before the PTO.

85.      For example, they knew that the DuPont reference and the 2013 Coakley Publication each disclosed using a metal foil as a conductive layer; they knew that the DuPont reference and the 2013 Coakley Publication each disclosed a substrate comprising an adhesive layer; and they knew that the DuPont reference and the 2013 Coakley Publication each disclosed the features recited in claim 16 of the '070 patent.

> **3.      The Withheld References Each Anticipate One or More Claims of the '070 Patent.**

86.      The sole claim that CelLink currently asserts against Manaflex—claim 1 of the '070 patent—is anticipated by, or at a minimum rendered obvious in light of, either or both of the DuPont reference and the 2013 Coakley Publication.

87.      Claim 1 of the '070 begins by reciting:  "A method of forming an interconnect circuit, the method comprising…."  The DuPont reference discloses this limitation.  And the 2013 Coakley Publication discloses this limitation.

  a.      For example, the DuPont reference discloses "processes for making back-sheets with integrated electrically conductive circuits…."  (p. 1:8-9.)

  b.      For example, the 2013 Coakley Publication discloses a "method of fabricating

an interconnect circuit….” (2013 Coakley Publication, claim 27).

88.     Claim 1 of the '070 next recites:

> laminating a substrate to a conductive layer, wherein the conductive
> layer is a metal foil, comprising a first side and a second side, opposite
> of the first side, and having a constant thickness, and wherein the
> substrate comprises an adhesive layer, laminated to the second side of
> the conductive layer….

89.     The DuPont reference discloses the limitation recited in the previous paragraph.  And the 2013 Coakley Publication suggests or discloses the limitation recited in the previous paragraph.

        a.      For example, the DuPont reference discloses that a “transfer sheet (protective film)”—“such as a polyester sheet coated with a pressure sensitive adhesive”—is adhered/laminated to “metal foil 33.”  (p. 6:17-18; p. 16:6-8; p. 30:20-24; p. 32:3-7; p. 33:20-24; p. 36:24-26.)  The DuPont reference also discloses examples of the foil are 30 μm or 35 μm thick copper foil.  (p. 12:2-9; p. 30:20-21; p. 32:3-4; p. 33:20-21.)  The DuPont reference also discloses that a roll-to-roll process can be used.  (p. 10:10-12.).

        b.      For example, the 2013 Coakley Publication discloses “laminating a conductive foil to a temporary carrier substrate comprising a low-tack adhesive….”  (2013 Coakley Publication, claim 27).  The 2013 Coakley Publication also discloses that the bottom surface of the conductive foil is “laminated” to a “temporary carrier substrate 510,” which includes a “temporary or low-tack adhesive” used to attach the foil 500 to the carrier substrate 510. (¶94.)  The 2013 Coakley Publication discloses that the conductive “foil” can be a metal, such as aluminum, (¶22), and that the foil can come from a “roll or sheet.” (¶94.)

90.     Claim 1 of the '070 patent next recites the following:

> patterning the conductive layer, while the conductive layer remains
> laminated to the substrate,
>
> wherein patterning the conductive layer forms a first conductive
> portion and a second conductive portion of the conductive layer, at
> least partially separated from the first conductive portion,
>
> wherein the substrate maintains orientation of the first conductive
> portion relative to the second conductive portion after patterning the
> conductive layer….

91.     The DuPont reference discloses the limitations recited in the previous paragraph.  And

ANSWER AND COUNTERCLAIMS
Case No. 4:23-cv-04231-HSG

the 2013 Coakley Publication discloses the limitations recited in the previous paragraph.

      a.     For example, the DuPont reference discloses these limitations in several portions of the text (*e.g.*, pp 15-16, 30-33), and its drawings (*e.g.*, Figs. 3, 4b, 4c).  As illustrated below, Figure 5B of the '070 patent and Figure 4b from the DuPont reference disclose a "first conductive portion" and a "second conductive portion" of a conductive layer after the conductive layer has been patterned (while the conductive layer is laminated to a substrate).  (Note:  the "First Conductive Portion" and "Second Conductive Portion" labels are annotations to DuPont Fig. 4b).

| '070 Patent, Figure 5B | DuPont Fig. 4b |
|---|---|



      b.     For example, the 2013 Coakley Publication discloses these limitations in several portions of the text (*e.g.*, ¶¶94-97, claim 27), and its drawings (Fig. 5B).  As illustrated below, Figure 5B of the '070 patent and Figure 5B from the 2013 Coakley Publication disclose a "first conductive portion" and a "second conductive portion" of a conductive layer after the conductive layer has been patterned (while the conductive layer is laminated to a substrate).  (Note:  the "First Conductive Portion" and "Second Conductive Portion" labels are annotations to 2013 Coakley Publication, Figure 5B).



Figure 5B

92.     Claim 1 of the '070 patent next recites:

> after patterning the conductive layer, laminating a first insulator to the first side of the conductive layer; and….

93.     The DuPont reference discloses the limitations recited in the previous paragraph.  And the 2013 Coakley Publication discloses the limitations recited in the previous paragraph.

a.     For example, the DuPont reference discloses that, after patterning a conductive metal foil, an insulator is laminated to the first side of the foil.  Disclosures of these features are at least at for example, on pages 16, 30-31, 32, and 34.

b.     For example, the 2013 Coakley Publication discloses that, after patterning a conductive foil, an insulator is laminated to the first side of the foil.  Disclosures of these features are at least at for example, in claim 27 of the 2013 Coakley Publication, as well as at paragraph 100 of the Publication.

94.     Finally, claim 1 of the '070 patent recites:

> after laminating the first insulator to the first side of the conductive layer, removing the substrate from the conductive layer,
>
> wherein the first insulator maintains the orientation of the first conductive portion relative to the second conductive portion after the substrate is removed.

95.     The DuPont reference discloses the limitations recited in the previous paragraph.  And the 2013 Coakley Publication discloses the limitations recited in the previous paragraph.

a.      For example, the DuPont reference discloses these limitations in several portions of the text (*e.g.*, pp 15-16, 31-32, 34), and its drawings (*e.g.*, Figs. 4b, 4c).  In the DuPont reference, the substrate (referred to as a "transfer sheet") is peeled away after patterning.  As illustrated below and to the left, Figure 4c from the DuPont reference discloses how the orientation of the first and second conductive portions is maintained throughout the process.  (Note:  the "First Conductive Portion" and "Second Conductive Portion" labels are annotations to DuPont Fig. 4b).

**DuPont Fig. 4c**                    **Coakley 2013 Pub. Fig. 5E**



b.      For example, the 2013 Coakley Publication discloses these limitations in several portions of the text (*e.g.*, ¶¶100-101, claim 27), and its drawings (Fig. 5E).  In the 2013 Coakley Publication, the temporary carrier substrate is peeled away after patterning.  As illustrated above and to the right, Figure 5E from the 2013 Coakley Publication discloses how the orientation of the first and second conductive portions is maintained throughout the process.

96.      The DuPont reference and the 2013 Coakley Publication each anticipate claim 1—or at a minimum render it obvious.  They also anticipate or render obvious the remaining claims of the '070 patent.

97.      The '070 patent would not have issued if CelLink had cited either the DuPont reference or the 2013 Coakley Publication to the PTO during the prosecution of the '070 patent's application.  At a minimum, claim 1 of the '070 patent would not have issued.

IV.  **CelLink Feared Competing with Manaflex and Used the '070 Patent in an Attempt to Improperly Disrupt CelLink's Business**

98.  CelLink presents itself as the significant domestic producer of flexible circuits for electric vehicles and, before Manaflex entered the market, experienced little competition.

99.  In February 2022, CelLink raised $250 million in series D funding round to build a factory in Georgetown, Texas.[2]  Disclosures to investors often include a company's current intellectual property.  As CelLink did in its Complaint, CelLink's disclosures presumably failed to disclose that its '070 patent was invalid and obtained through misrepresentations to, and deception of, the PTO.

100.  On May 12, 2023, the United States Department of Energy (DOE) announced a conditional commitment to CelLink for a $362 million loan to help finance the construction of a manufacturing facility in Georgetown, Texas meant to develop "lighter and more efficient flexible circuit wiring harnesses for automotive and other industries".[3]  To obtain the loan, CelLink estimated that the new facility would produce flex harnesses to support approximately 2.7 million electric vehicles and told the DOE that that its "new" proprietary technology of having a "flat design" of its flex harness would make CelLink competitive in the industry.[4]  CelLink told the DOE that it anticipated increased demand for its flexible circuits.

101.  Before conditionally committing to offer a loan, the DOE engages in a thorough due diligence process.[5]  This process includes, technical, market, financial, credit, legal, and regulatory reviews.  As a part of these reviews, DOE relies upon information provided by applicants.  In this process, DOE would certainly have requested information about any CelLink patents related to the technology in which DOE would be investing hundreds of millions of dollars.  As CelLink did in its Complaint, CelLink's disclosures presumably failed to disclose that its '070 patent was invalid and

---

[2] https://www.reuters.com/business/autos-transportation/strategic-investors-back-startup-cellinks-250-million-funding-round-2022-02-16/ (last visited November 13, 2023).

[3] https://www.energy.gov/lpo/articles/lpo-announces-conditional-commitment-loan-cellink-corporations-us-manufacturing (last visited November 13, 2023).

[4] *Id.*

[5] https://www.energy.gov/lpo/application-process (last visited November 13, 2023

obtained through misrepresentations to, and deception of, the PTO.

102.    Shortly after the DOE's announcement of its conditional commitment to loan CelLink $362 million, by in or about the Summer of 2023, CelLink learned that it was going to lose business and at least one client account to Manaflex.  CelLink worried that it would continue to lose business to Manaflex if it had to compete directly with Manaflex on innovation and pricing, as Manaflex was innovating new manufacturing processes that are better and at lower price points.

103.    In order to make an example out of Manaflex, one of the first direct competitors to emerge into the market, in an attempt to deter others from competing in the market of flexible circuits for electric vehicles.

104.    In or around the Summer of 2023, CelLink's salesforce began disparaging Manaflex to individuals within the industry and saying that CelLink was going to come after Manaflex.  And while Manaflex was focused on growing its company and innovating new and better products, CelLink made good on those threats.

105.    On August 18, 2023, CelLink filed this lawsuit against Manaflex alleging that Manaflex has infringed on a patent that CelLink, and its CEO, knows to be invalid—the '070 Patent. CelLink simultaneously alleged that Manaflex "misappropriated" CelLink's "trade secrets" without identifying—even at a high-level what the trade secrets are—or explaining how Manaflex has "misappropriated" these "trade secrets."  The Complaint lacked any detail to CelLink's allegations and was primarily based on CelLink's known invalid '070 Patent.  CelLink's claims are objectively baseless and asserted in subjective bad faith.

106.    After filing the lawsuit, CelLink hastily began sending communications to Manaflex's clients and potential clients appraising them of the lawsuit.  From August of 2023 to the present, Manaflex has responded to inquiries from clients and potential clients that were based on CelLink's having filed the lawsuit.  CelLink knew that the lawsuit would raise concerns from clients and would be what appeared any time a prospective client would google Manaflex.

107.    It was CelLink's motive, plan, and desire that this lawsuit slow Manaflex's momentum and keep Manaflex from being able to fully compete with CelLink due to the distractions and costs of dealing with a lawsuit of this nature.

108.    CelLink wanted to, planned to, and did disrupt Manaflex's financing, business operations, innovation, and growth by filing a lawsuit based upon a patent, that CelLink and its CEO knew that the basis of the lawsuit, CelLink's '070 Patent is invalid.

## V.    Counterclaim Causes of Action

### A.    Jurisdiction and Venue

109.    This Court has jurisdiction over the counterclaims under 28 U.S.C. §§ 1331, 1332, 1338, 1367, 2201, and/or under Rule 13 of the Federal Rules of Civil Procedure.  There exists a justiciable controversy between the parties as to whether CelLink is liable for infringement of the '070 patent and whether the patent is invalid and unenforceable.  With respect to the state-law counterclaims, there is diversity of citizenship, and the controversy exceeds $75,000.

110.    To the extent a showing of personal jurisdiction and venue is required, they are proper here:  including because CelLink's principal place of business is in this District.  *See* 28 U.S.C. 1391(b) (general venue statute).

### B.    Count One:  '070 Patent Invalidity

111.    Manaflex incorporates by reference and realleges each of the preceding paragraphs.

112.    The asserted claims of the '070 patent are invalid under the Patent Act, 35 U.S.C. §§ 1 *et seq.*, including under sections 102 (anticipation), 103 (obviousness), 112 (specification), and for not listing the correct inventors (sections 101, 116, 256).

### C.    Count Two:  '070 Patent Unenforceability

113.    Manaflex incorporates by reference and realleges each of the preceding paragraphs.

114.    The '070 patent is unenforceable due to inequitable conduct based on CelLink— including at least Mr. Coakley and patent prosecution counsel (*e.g.*, Mr. Gusev)—failing to disclose material prior art with an intent to deceive the PTO.

115.    For example, Mr. Coakley and Mr. Gusev—and perhaps other named inventors and others at CelLink—knew that the '070 patent purported to differentiate the patent from conventional processes through the use of a temporary substrate as a base layer (on which a conductive layer would be etched).  They knew there was prior art disclosing the use of a temporary substrate as a base layer (*e.g.*, the DuPont reference and the 2013 Coakley Publication).  They knew they had a

duty to disclose material information to the PTO.  Yet, they never cited those withheld references to the PTO during the '070 patent application's prosecution—or any other references disclosing that feature.

116.    Then, after the PTO found prior art it believed disclosed that feature, CelLink amended the '070 patent application claims to include the use of "metal foil" as the conductive layer—a feature CelLink (including at least Mr. Coakley and Mr. Gusev) knew was disclosed in the very same withheld references (the DuPont reference and the 2013 Coakley publication, referred to below as "withheld references").

117.    The PTO relied on that "metal foil" claim limitation to allow all of the '070 patent claims.  It also referenced other features missing from the prior art of record, which Mr. Coakley and Mr. Gusev knew was disclosed in the withheld references (see above descriptions).

118.    There is no conceivable way that both Mr. Coakley and Mr. Gusev were unaware of these withheld references and their disclosures at the time of the amendment to the '070 patent application's claims.

119.    There is no conceivable way that Mr. Coakley and Mr. Gusev were both unaware of the importance of these withheld references to the PTO's examination of the '070 patent application's claims.  Indeed, as described above, the references disclose each and every limitation of at a minimum claim 1 of the '070 patent—or at a minimum render it obvious.

120.    Yet, Mr. Coakley and Mr. Gusev (and perhaps other named inventors or other CelLink representatives) willfully ignored their duty to disclose material prior art and did not cite either of the withheld references.

121.    Mr. Coakley and Mr. Gusev (and perhaps other named inventors or other CelLink representatives) intended to deceive the PTO by withholding these withheld references.  It is the single reasonable inference that can be drawn from the evidence.

122.    The withheld references are more material than any of the prior art of record in the '070 patent application's prosecution history.  And if either of these withheld references were cited to the PTO, the '070 patent would not have issued—at a minimum claim 1 of the '070 patent would not have issued.

123.     The '070 patent is also unenforceable for inequitable conduct due to the submission of egregiously false declarations to the PTO by one or more of the named inventors, with the intent to deceive.

124.     In March through April 2019, four of the named inventors—Messrs. Coakley, Brown, Yang, and Lego — signed declarations that were submitted to the PTO in May 2020.  In each declaration, the named inventors swore:  "I believe that I am the original joint inventor of a claimed invention in the application."  Mr. Coakley understood that neither he nor any of the named inventors were the inventors of claim 1—the concept was disclosed in the DuPont reference.  And Mr. Coakley is the sole named inventor on the 2013 Coakley Publication, which discloses or renders obvious the remaining claims.  There is no conceivable way that all of the other named inventors on the '070 patent could have believed they were co-inventors.

**D.     Count Three:  Intentional Interference with Prospective Economic Advantage**

125.     Manaflex incorporates by reference and realleges each of the preceding paragraphs.

126.     Manaflex has prospective economic relationships with its current and prospective clients, and its current and prospective investors. These economic relationships have a probable future economic benefit or advantage to Manaflex, and it is reasonably likely and probable that Manaflex would have realized economic advantages from these relationships absent CelLink's wrongful conduct.

127.     CelLink had knowledge of the existence of these prospective economic relationships. Indeed, CelLink has contacted a number of Manaflex's clients and prospective clients directly regarding their use of Manaflex's software support services.  CelLink also had knowledge of the fact that Manaflex was seeking investments.

128.     CelLink has intentionally interfered with the prospective economic relationships by, for example, making numerous false and misleading representations to Manaflex's current and prospective clients regarding Manaflex's including, but not limited to, CelLink asserting that it had a valid patent, the '070 patent, that Manaflex was infringing.

129.     These actions by CelLink were designed to disrupt Manaflex's prospective economic

relationships with its current and prospective clients and current and prospective investors in order for CelLink to obtain an unfair competitive advantage over Manaflex. Indeed, CelLink knew that its actions are certain or substantially certain to disrupt Manaflex's prospective economic relationships.

130.   CelLink's actions to interfere with Manaflex's prospective economic relationships are independently wrongful acts because they are proscribed by California Business and Professions Code §§ 17200 *et seq.*

131.   CelLink's intentional interference has actually disrupted Manaflex's prospective economic relationships with some of its current and prospective clients.

132.   As a direct and proximate result of CelLink's intentional interference with Manaflex's prospective economic relationships, Manaflex has now suffered and will continue to suffer, economic harm, including, but not limited to, lost profits, costs of mitigation, loss of goodwill, injury to Manaflex's business reputation, and other actual, consequential, and/or incidental damages in an amount to be determined in the course of this proceeding. CelLink's wrongful conduct described herein was a substantial factor in causing this harm.

133.   In engaging in this concerted campaign to interfere with Manaflex's prospective economic relationships with its current and prospective clients and current and prospective investors, CelLink's conduct was willful, malicious, oppressive, and in conscious disregard for Manaflex's rights. Manaflex is therefore also entitled to an award of punitive damages to punish CelLink's wrongful conduct and to deter future wrongful conduct.

**E.      Count Four:  Intentional Interference with Contractual Relations**

134.   Manaflex incorporates by reference and realleges each of the preceding paragraphs.

135.   At all relevant times, Manaflex maintained valid contracts with third-party clients to provide high-conductance flexible circuits.

136.   At all relevant times, CelLink knew and should have known of the existence of these contracts between Manaflex and its clients.  Indeed, CelLink contacted Manaflex's clients directly regarding their use of Manaflex's products.

137.   In doing so, CelLink acted to introduce fear, uncertainty, and doubt among Manaflex's clients for the purpose of interfering with and disrupting valid Manaflex contracts.

CelLink's conduct includes, without limitation, several false and misleading representations regarding the validity of CelLink's intellectual property used to produce its high-conductance flexible circuits as well as Manaflex's alleged infringement.

138.    CelLink's actions were calculated and designed to induce Manaflex's clients to potentially breach their Manaflex contracts or, at minimum, to disrupt those contracts in order for CelLink to obtain an unfair competitive advantage over Manaflex. CelLink knew that its actions are certain, or substantially certain, to cause the breach and/or disruption of the contracts between Manaflex and its clients.

139.    CelLink's intentional interference has resulted in actual damages through the disruption of its contracts with its clients. Manaflex been forced to dedicate substantial resources to investigate and respond to client concerns related to CelLink's wrongful conduct, thereby impairing Manaflex's enjoyment of its contracts by making them more expensive and more burdensome.

140.    As a direct and proximate result of CelLink's intentional interference with Manaflex's contractual relations, Manaflex has now and continues to suffer economic harm, including, but not limited to, costs of mitigation, injury to its business reputation, and other actual, consequential, and/or incidental damages in an amount that continues to grow. CelLink's wrongful conduct was, at minimum, a substantial factor in causing Manaflex's harm.

141.    By engaging in this scheme to wrongfully interfere with the contractual relations between Manaflex and its clients, CelLink's conduct was willful, malicious, oppressive, and in conscious disregard for Manaflex's rights. Manaflex is therefore entitled to an award of punitive damages to punish CelLink's wrongful conduct and to deter future wrongful conduct.

**F.    Count Five:  Unfair Competition (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

142.    Manaflex incorporates by reference and realleges each of the preceding paragraphs.

143.    The acts and conduct of CelLink constitute "unfair" conduct as defined by California Bus. & Prof. Code §§ 17200, *et seq.*  CelLink's actions in filing a lawsuit based on the '070 patent that CelLink and its CEO knew to be invalid, significantly threatens and harms competition.  By obtaining an invalid patent by purposefully hiding its own prior art from the PTO and then trying to

use that invalid patent offensively when a company, here Manaflex, is emerging as a potential soon-to-be significant competitor, CelLink improperly seeks to threaten and harm competition.

144.    The acts and conduct of CelLink constitute "unlawful" conduct as defined by California Bus. & Prof. Code §§ 17200, *et seq.*  CelLink in obtaining hundreds of millions of dollars in loans likely did not disclose that its '070 patent is invalid.  This omission would likely be relevant and material to the DOE and other lenders.[6]

145.    The acts and conduct of CelLink constitute fraudulent conduct as defined by California Bus. & Prof. Code §§ 17200, *et seq.*  As evidence of CelLink's fraudulent business practices, upon information and belief, CelLink, and its agents, caused false and disparaging allegations to be published and republished to Manaflex's existing customers. Upon information and belief, CelLink, and its agents, continue to publish and republish false and disparaging allegations to Manaflex's potential customers with which Manaflex has established potential business relationships. These allegations were made with CelLink's intent to, and are likely to, deceive members of the public, including Manaflex's existing and prospective clients.

146.    As a result of CelLink's actions, Manaflex has and continues to suffer irreparable injury to its reputation and standing in the industry. Manaflex will continue to suffer the irreparable harm caused by CelLink's conduct unless CelLink is enjoined.

147.    CelLink should be compelled to disgorge and/or restore any and all revenues, earnings, profits, compensation, and benefits it may have obtained in violation of California Business & Professions Code § 17200 *et seq.*, including, but not limited to, returning any revenue earned as a proximate result of the unlawful publication of the deceptive statements made to the public.

## DEMAND FOR RELIEF ON MANAFLEX'S COUNTERCLAIMS

WHEREFORE, in light of the foregoing allegations, Manaflex seeks judgment awarding it the following relief:

(a) A declaration that the '070 patent is unenforceable and that the asserted claims are

---

[6] On October 6, 2023, Manaflex submitted a FOIA request to the DOE for production of all statements, information, reports, and material that CelLink provided to the DOE in its application for the $365 million loan.

1   invalid;

2       (b) Damages in an amount to be determined at trial;

3       (c) Injunctive relief, including an order prohibiting CelLink from engaging in the wrongful

4   conduct described herein and remedying the harm caused by CelLink's conduct;

5       (d) Punitive damages in an amount to be determined at trial;

6       (e) Attorneys' fees, costs, and expenses incurred in connection with this action; and

7       (f) All such other and further relief as this Court deems just and proper.

8   **DEMAND FOR JURY TRIAL ON MANAFLEX'S COUNTERCLAIMS**

9       Manaflex demands a jury trial on all issues triable by jury.

10

11   Dated: November 15, 2023        By:   */s/Alison L. Anderson*

12                                                   Alison L. Anderson (SBN 275334)
Joshua Y. Quaye (SBN 325480)

13   BOIES, SCHILLER & FLEXNER LLP
2029 Century Park East, Suite 1520

14   Los Angeles, CA 90067
(213) 995-5720

15   alanderson@bsfllp.com
jquaye@bsfllp.com

16

17   Eric J. Maurer (*pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP

18   1401 New York Ave., NW
Washington, DC 20005

19   (202) 237-2727
emaurer@bsfllp.com

20

21   Beko Reblitz-Richardson (SBN 238027)
BOIES, SCHILLER & FLEXNER LLP

22   44 Montgomery Street, 41st Floor
San Francisco, CA 94104

23   (415) 293-6800
brichardson@bsfllp.com

24

25   *Attorneys for Defendant Manaflex LLC*

26

27

28

ANSWER AND COUNTERCLAIMS
Case No. 4:23-cv-04231-HSG

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the below date this document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

Dated:  November 15, 2023                    */s/Alison L. Anderson*
                                                              Alison L. Anderson